IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA,

      v.                                                        Criminal No. 4:20cr18 (DJN)

WILLIAM WELLINGTON HOOPER, JR.,
Defendant.

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant William Wellington Hooper's ("Defendant") Motion to Suppress ("Motion" (ECF No. 28)), moving to suppress any evidence discovered on, or derived from, two cellular telephones seized by law enforcement agents on two separate occasions. For the reasons set forth below, Defendant's Motion will be DENIED.

**I.    BACKGROUND**

**A.    Procedural History**

On May 5, 2020, the Government filed a Superseding Indictment ("Indictment" (ECF No. 7)), charging Defendant with four counts: Count One, Conspiracy to Produce Child Pornography; Count Two, Production of Child Pornography; Counts Three and Four, Coercion and Enticement. Specifically, the Government alleges that, in April and May of 2019, Defendant conspired with Jennifer Hutchens ("Hutchens") to obtain sexually explicit photographs of Jane Doe 1 and Jane Doe 2, both minors. In furtherance of these crimes, the Government alleges that Defendant communicated with Hutchens and the minors via text messaging, including the arrangement for and taking of sexually explicit photographs. Additionally, the Government alleges that Defendant conversed with Hutchens via text message about Defendant having sexual

intercourse with Jane Doe 1 for payment. Further, the Government alleges that Defendant and Hutchens used the internet to transmit images of child pornography.

On June 16, 2020, Defendant filed his Motion to Suppress, seeking to suppress all evidence gathered from his cell phones. (Mot. at 1.) The Government filed a response ("Govt's Resp." (ECF No. 37)). On July 10, 2020, the Court held an evidentiary hearing on Defendant's Motion, hearing testimony from law enforcement agents, Defendant's wife, Robin Hooper, and an employee of Robin Hooper's company, James Smith ("Smith"). (ECF No. 44.) At the conclusion of the hearing, the Court found the testimony of the law enforcement agents and Smith credible. (Tr. of July 10, 2020 Hr'g ("Tr.") (ECF No. 58) 128:24-5.) To the extent that Robin Hooper's testimony with respect to the seizure of the phone from the Outback Steakhouse conflicted with the law enforcement agent's testimony, the Court found Robin Hooper not credible. (Tr. 128:25-129:2.) And, the facts must be viewed through the lens of the Court's credibility findings.

Based on the evidence adduced, the Court ordered additional briefing on whether Defendant had an expectation of privacy in the area from which law enforcement seized the second phone. On July 24, 2020, Defendant filed his Supplemental Memorandum in Support of the Motion to Suppress ("Def.'s Sup. Br." (ECF No. 49)), addressing his expectation of privacy. On July 31, 2020, the Government filed its supplemental memorandum ("Govt's Sup. Br." (ECF No. 53)), responding to Defendant's Supplemental Brief. The matter is now ripe for review.

**B.  Facts**

On November 7, 2019, the Government alleges that the Gloucester County Sheriff's Office received information from an informant that Jane Doe 1, 15 years old at the time, had

been the victim of a crime involving Defendant and Hutchens.[1] (Govt's Resp. at 3.) Specifically, the informant claimed that Defendant had sent text messages to Hutchens describing the sexual acts that Defendant wanted to perform with Jane Doe 1. (*Id.*; Tr. 34:5-14.) Further, Hutchens had driven Jane Doe 1 to Defendant's residence in Mathews County to clean Defendant's yacht. (Govt's Resp. at 3.) Once there, Defendant had Jane Doe 1 engage in a sexual act in exchange for money. (*Id.*) Additionally, Hutchens allegedly sent nude photographs of Jane Doe 1 to Defendant on his phone. (*Id.*; Tr. 34:22-35:5.)

On November 20, 2019, investigators with the Mathews County Sheriff's Office ("MCSO") obtained state search warrants to search Defendant's home and yacht, as well as an arrest warrant for Defendant. (Govt's Resp. at 3-4; Tr. 35:14-24.) The next day, investigators executed the search warrants, but could not arrest Defendant, because he was not home. (Govt's Resp. at 4.) On November 22, 2019, the MCSO determined Defendant's location to be at an Outback Steakhouse in Waldorf, Maryland ("Outback"), and notified the Charles County Sheriff's Office ("CCSO") of this fact and that the MCSO wanted Defendant for multiple felonies against children. (Tr. 7:20-8:15.) MCSO had instructed CCSO to seize Defendant's phone if they could, although it did not have a warrant authorizing the seizure. (Tr. 12:21-23.)

According to the testimony of Officer Ashton Brown ("Officer Brown") of the CCSO, three officers entered Outback to apprehend Defendant. (Tr. 9:13-16; 10:7.) They found Defendant seated at a table with his wife and child. (Tr. 10:16-11:2.) As the officers approached his table, Officer Brown noticed Defendant's phone (the "Outback Phone") within inches of Defendant's hands, next to his plate. (Tr. 11:5-12:11.) The officers asked Defendant to go

---

[1] The Court cites to alleged facts in the Government's brief for background purposes only. It does not take any of the alleged facts drawn from the Government's brief as evidence in its analysis of Defendant's Motion. The suppression analysis draws only on the evidence adduced during the evidentiary hearing on July 10, 2020.

3

outside and, as he stood up, Officer Brown took Defendant's phone from the table. (Tr. 12:21-24.) They escorted Defendant to the back of the restaurant and handcuffed him there before escorting him outside. (Tr. 15:12-17.) Once outside, Officer Brown activated the dashboard camera in his police cruiser and the officers escorted Defendant to the front of the cruiser. (Tr. 18:4-11.) Then, Officer Brown put Defendant's phone on the hood of the cruiser as the officers patted down Defendant, removing his keys and wallet from his pockets and placing them next to the phone. (Tr. 20:10-13.) At no point during this process did Defendant struggle or resist arrest. (Tr. 24:8-10.) The officers secured the phone and eventually transferred it and Defendant to the custody of MCSO on December 19, 2019. (Tr. 16:4-6; Gov't Resp. at 4.) On January 15, 2020, the Government obtained a federal search warrant to search the phone.[2] (Govt's Resp. at 1, 4.) The state subsequently released him on bond.

On May 8, 2020, Homeland Security Investigations ("HSI") agents went to the area of Defendant's residence in Mathews County to execute an arrest warrant for Defendant in connection with the Indictment. (Tr. 37:2-7; 57:12-15.) HSI had air support from Customs and Border Protection, and the United States Coast Guard had a cutter on standby. (Tr. 37:8-20.)

HSI Agent Jason Brumbelow ("Agent Brumbelow") testified that HSI had the cell phone used by Hutchens to communicate with Defendant and it knew that Defendant had used multiple phones to exchange text messages and images with both Hutchens and Jane Doe 1. (Tr. 34:5-9.) HSI also believed that other phones existed that it suspected Defendant had used in the commission of the alleged crimes. (Tr. 34:12-21; 35:6-10.) Despite this, HSI inexplicably failed to obtain a warrant for Defendant's phone and never discussed obtaining a search warrant before May 8, 2020. (Tr. 53:3-25; 56:6-8; 73:18-74:15.)

---

[2] Defendant only challenges the seizure of the phone, not the chain of custody or the search warrant. (Tr. 29:16-21.)

4

Agent Brumbelow testified that law enforcement agents observed Defendant drive from his residence to a Quonset hut located on the adjacent property. (Tr. 41:19-42:3.) The adjacent property belonged to Robin Hooper's parents, the Eleys. (Tr. 56:17-20.) Robin Hooper's company, Williams Wharf Oyster Company, LLC ("Williams Wharf Oyster"), leased the Quonset hut on the Eley's property and the pier behind the Eley's property. (Tr. 39:19-23; 74:20-23; 104:12-105:4.) Defendant had no ownership stake in Williams Wharf Oyster and drew no salary from Williams Wharf Oyster, but Robin Hooper testified that Defendant helped her with the company. (Tr. 105:13-106:15.) Williams Wharf Oyster also used a platform attached to the pier for working on the oysters. (Tr. 103:15-16.) This platform has no propulsion but has the potential to move. (Tr. 103:20-24.) However, it typically does not move. (Tr. 116:8-22.)

Around the time that HSI entered the property, Defendant and Smith, a Williams Wharf Oyster salaried employee, were on the platform culling oysters. (Tr. 116:1-7.) When they saw the law enforcement agents, Defendant put his phone (the "Pier Phone") and knife on top of the culling table. (Tr. 117:10-118:3.) He then walked up the pier towards the property, where HSI agents arrested him. (Tr. 47:3-48:2.) At no time did Defendant attempt to flee or resist arrest. (Tr. 80:12-16.) As MCSO transported Defendant back to its office, Agent Brumbelow approached Defendant's house and spoke with Robin Hooper. (Tr. 48:15; 49:8-14.) She gave Defendant's medicine to him, which he took back to the Sheriff's office. (Tr. 49:11-14.)

After Defendant's arrest, Smith put the phone and knife in a cinderblock on the platform and covered it with another cinderblock to protect it. (Tr. 119:22-120:1.) Several hours later, a deputy with the MCSO received a call from Daniel Reid, another salaried employee of Williams Wharf Oyster, who told him that Defendant had put the phone and knife in a cinderblock before his arrest. (Tr. 50:22-51:10; 112:10-113:14.) Upon learning this, Agent Brumbelow set out to

recover the phone, as he believed that it could have evidence that might get destroyed in the elements. (Tr. 52:1-53:2.) Agent Brumbelow knocked on the Eley's door to obtain their consent to enter onto the pier, but they did not answer. (Tr. 58:17-22.) Because Agent Brumbelow had determined that Williams Wharf Oyster leased the pier, he then returned to Robin Hooper's house to obtain consent. (Tr. 61:5-15.) He asked her if he could go on the pier to recover some property. (Tr. 61:20-23.) She gave her consent, although she asked the agents to cover up their firearms and law enforcement markings to avoid alarming her parents. (Tr. 62:1-9.) From the pier, Agent Brumbelow called Daniel Ried to determine where Defendant had put the phone. (Tr. 66:7-17.) Reid told him that he could find the phone near the table. (Tr. 66:17-18.) Agent Brumbelow located and seized the phone. (Tr. 66:17-20; 68:20-21; 69:16-17.) On June 18, 2020, the Government obtained a federal search warrant for the contents of the phone. (Govt's Resp. at 1, 5.) Defendant remains in custody.

C. **Defendant's Motion to Suppress**

Defendant moved to suppress any evidence found on the phones. Defendant argues that the seizures do not fall into any of the exceptions that allow for warrantless seizures. (Mot. at 3.) Specifically, Defendant argues that neither seizure can fall into the search incident to arrest exception, because they did not occur contemporaneously with the arrest. (Mot. at 5-6.) Defendant also argues that he did not abandon either phone. (Mot. at 5-6.) In his supplemental brief on his privacy interest, Defendant argues that he has an expectation of privacy in the platform, because it constitutes his workplace. (Def.'s Sup. Br. at 6.) In response, the Government claims that law enforcement properly seized the Outback Phone as part of a search incident to arrest. (Govt's Resp. at 6-8.) With respect to the Pier Phone, the Government argues that Defendant lacks an expectation of privacy in the platform based on the open fields doctrine

6

and, therefore, cannot raise a Fourth Amendment challenge to the seizures. (Govt's Resp. at 9.) Additionally, the Government argues that exigent circumstances justify the seizures of both phones. (Govt's Resp. at 12.)

## II. ANALYSIS

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The safeguard of this right comes in the form of the exclusionary rule, which dictates that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974). As the Supreme Court has made clear, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). When law enforcement officials undertake a search or seizure to discover evidence of criminal wrongdoing, "reasonableness generally requires the obtaining of a judicial warrant." *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). If the officials do not obtain a warrant, "a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014). Here, law enforcement officials failed to obtain warrants for either of the phones that they ultimately seized. Consequently, Defendant claims that both seizures violated his Fourth Amendment rights. The Court will examine each seizure in turn.

### A. The Outback Phone

The seizure of the Outback Phone invokes the possibility of the search incident to arrest exception to the warrant requirement. The search incident to arrest exception allows officers,

7

with probable cause for a lawful custodial arrest, to search the area within the control of the arrestee "incident to that arrest and without a warrant." *United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)). The reasonableness of a search incident to arrest stems from the need to remove any weapons that could harm the arresting officer or effect the arrestee's escape, as well as the need to prevent the concealment or destruction of evidence. *Chimel*, 395 U.S. at 762-63. However, the constitutionality of the search does not require any indication that the arrestee possesses weapons or evidence. *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979). Rather, "[t]he fact of a lawful arrest, standing alone, authorizes a search." *Id.* Here, Defendant does not dispute that the CCSO conducted a lawful arrest, as MCSO had obtained an arrest warrant based on probable cause. Instead, Defendant argues that the seizure falls outside of the scope of the search incident to arrest exception.

A search incident to arrest "must be limited in scope to that which is justified by the particular purposes served by the exception." *Currence*, 446 F.3d at 556 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). This scope limitation includes both geographic and temporal limits. *Id.* at 557. With respect to the geographic limitation, the search "must be confined to the arrestee's person and the area within the arrestee's 'immediate control,' which is 'the area into which an arrestee might reach in order to grab a weapon or evidentiary items.'" *Id.* (citing *Chimel*, 395 U.S. at 763). The Fourth Circuit has recognized that "the Supreme Court has interpreted broadly both the area under 'immediate control' and the likelihood of danger or destruction of evidence." *United States v. Han*, 74 F.3d 537, 542 (4th Cir. 1996).

The seizure of the Outback Phone falls within the geographical limitations of the rule even without affording the rule a broad interpretation. Officer Brown testified that the Outback

Phone rested on the table "within inches" of Defendant's hands when he approached the table. (Tr. 11:15-12:11.) Defendant's wife "could have easily grabbed" the phone. (Tr. 13:2-5.) As Defendant stood up, and with the phone still within his reach, Officer Brown seized the phone. (Tr. 12:23-24.) He testified that he then placed it on the hood of his cruiser as they led Defendant outside to conduct a more thorough search of his person before putting him in the cruiser. (Tr. 14:16-23.) The dashcam video confirms this, showing Officer Brown placing the phone on the hood of his cruiser as soon as they enter the frame. (Gov't Ex. 1.)

Conversely, Robin Hooper testified to a different series of events. She testified that the officers did not seize the phone as they escorted Defendant out of the restaurant. (Tr. 94:19-95:11.) Instead, they returned one to two minutes after escorting Defendant away from the table to seize the phone, which Robin Hooper testified had been in the middle of the table. (Tr. 95:1-12.) The Court finds Officer Brown's testimony on this series of events more credible than Robin Hooper's, especially given that the dashcam video confirms his testimony. Accordingly, the Court makes the factual finding that Officer Brown seized the phone from a place within inches of Defendant's hands as Defendant stood up from the table. At that time, Defendant (or his wife) could have easily grabbed the phone and destroyed any evidence thereon. Accordingly, the seizure occurred well within the geographic limits of the search incident to arrest exception.

Likewise, the seizure occurred well within the temporal limit of the exception. That boundary requires that officers conduct the search or seizure at a time "substantially contemporaneous with the arrest." *Currence*, 446 F.3d at 557 (quoting *Stoner v. California*, 376 U.S. 483, 486 (1964)). Based on Officer Brown's testimony, he seized Defendant's phone at the same time that he initiated the arrest. (Tr. 12:23-24.) Given that the "Fourth Amendment does

9

not prohibit a reasonable delay," *Han*, 74 F.3d at 543, a seizure at the time of arrest does not run afoul of the temporal limits of the search incident to arrest exception.

The facts of this case — a seizure from an area in Defendant's immediate control at the same time that the officers executed a lawful arrest pursuant to a warrant — do not require the Court to examine the outer boundaries of the search incident to arrest exception. Rather, this seizure falls squarely within the exception, and the officers could lawfully seize the phone and obtain a warrant later to search its contents. *See Riley v. California*, 573 U.S. 373, 388 (2014) (describing as "sensible" the defendants' concession "that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant"). Accordingly, Defendant's Motion with respect to the Outback Phone will be DENIED.

**B.     The Pier Phone**

Defendant also argues that the warrantless seizure of the Pier Phone does not fall into any of the exceptions to the Fourth Amendment's warrant requirement. The Government responds that the Court need not examine any Fourth Amendment exceptions, because Defendant lacks standing to raise a Fourth Amendment challenge to the seizure of the Pier Phone based on the "open fields" doctrine. Defendant claims that his standing arises from the fact that the platform connected to the pier constituted his workplace, giving him an expectation of privacy in the platform. The Court agrees with the Government that Defendant lacks standing to raise his Fourth Amendment challenge, but it bases this conclusion on the fact that Defendant has no expectation of privacy in the platform regardless of the "open fields" doctrine. Further, Defendant lost any expectation of privacy that he may have had in the phone when he abandoned it.

### i. *Fourth Amendment Standing*

"It is axiomatic that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) (internal quotations omitted). A person cannot vicariously assert the right to be free from an unreasonable search. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Thus, an individual's "capacity to claim the protection of the Fourth Amendment" depends on whether that individual "has a legitimate expectation of privacy in the invaded place." *Gray*, 491 F.3d at 144. As such, courts focus the inquiry on the area searched rather than the items found. *United States v. Manbeck*, 744 F.2d 360, 374 (4th Cir. 1984) ("The privacy interest that must be established to support standing is an interest in the area searched, not an interest in the items found."). If the individual lacks an expectation of privacy in the area searched, "the individual lacks 'standing' and the inquiry ends without consideration of the merits of the search claim." *United States v. Ferebee*, 957 F.3d 406, 412 (4th Cir. 2020).

Importantly, "[t]he burden of showing a legitimate expectation of privacy in the area searched rests with the defendant." *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir. 2013). To meet this burden, the defendant must satisfy two prongs by a preponderance of the evidence. *See id.* at 833 (holding that the defendant failed to show an expectation of interest by a preponderance of the evidence). First, the defendant "must have a subjective expectation of privacy." *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010). Second, that subjective expectation of privacy must be "objectively reasonable; in other words, it must be an expectation that society is willing to recognize as reasonable." *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011) (internal quotations omitted).

11

For the sake of the analysis, the Court will assume that Defendant had a subjective expectation of privacy in the platform, as the Government concedes (Govt's Supp. Mem. at 5). Thus, the question here turns on whether Defendant's expectation of privacy in the platform constitutes an objectively reasonable expectation. This objectively reasonable expectation of privacy must flow from "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

### ii. Property Interest

Defendant's expectation of privacy cannot flow from any concepts of real or personal property law. First, he has not shown any ownership interest in the pier or platform connected to it. Defendant did not own the pier, the Eleys did.[3] (Tr. 104:12-25.) Defendant did not lease the pier, Williams Wharf Oyster did. (Tr. 104:13-16.) And Defendant had no ownership stake in Williams Wharf Oyster, Robin Hooper owned it outright. (Tr. 105:22-106:4.)

Nor can Defendant assert any interest in the platform as property held by another.[4] "Factors that courts consider in determining if a person has a reasonable expectation of privacy in property held by another include whether that person claims an ownership or possessory interest in the property, and whether he has established a right or taken precautions to exclude others from the property." *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992); *see also*

---

[3] The record does not demonstrate who owns the platform connected to the pier. Presumably either the Eleys own it and lease it to Williams Wharf Oyster, or Williams Wharf Oyster owns it and connects it to the pier that it leases from the Eley. Nevertheless, this distinction bears no relevance to the analysis. Importantly, Defendant has offered no evidence that he has any ownership interest in the platform.

[4] To the extent that either the Eleys or Robin Hooper could cry foul for law enforcement entering the pier, that has no bearing on Defendant's Fourth Amendment challenge. *See Gray*, 491 F.3d at 144-45 ("A search can therefore be unconstitutional with respect to one person, yet the evidence obtained therefrom admissible against a second person.").

*Byrd v. United States*, 138 S.Ct. 1518, 1527 (2018)("One of the main rights attaching to property is the right to exclude others, and in the main, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude."). Defendant has offered no evidence that he took any precautions to exclude others from the platform. In short, Defendant had no property interest in the platform and, therefore, his objectively reasonable expectation of privacy cannot flow from "reference to concepts of real or personal property law." *Carter*, 525 U.S. at 88. Thus, Defendant must show that his subjective expectation is "an expectation that society is willing to recognize as reasonable." *Castellanos*, 716 F.3d at 832.

### iii. Society's Recognition of a Reasonable Expectation of Privacy

In determining whether society will recognize Defendant's expectation as reasonable, the Court notes that the commercial use of the platform diminishes any expectation of privacy that society would recognize as reasonable. *Gray*, 491 F.3d at 146 (recognizing that the "expectation of privacy in commercial premises ... is different from, and indeed less than, a similar expectation in an individual's home" (quoting *Carter*, 525 U.S. at 90)). Defendant bases his argument that society will recognize his expectation of privacy in the platform as reasonable on the fact that the platform constitutes his place of work. This argument lacks merit.

The Supreme Court has "recognized that employees may have a reasonable expectation of privacy against intrusions by police." *O'Connor v. Ortega*, 480 U.S. 709, 716 (1987) (citing *Mancusi v. DeForte*, 392 U.S. 364 (1968)). Defendant urges an exceedingly broad interpretation of this rule wherein an individual enjoys a reasonable expectation of privacy in any area that could be considered his place of work. But, this stretches the rule in two distinct and

13

impermissible ways: (1) who can enjoy the expectation of privacy, and (2) the area that an employee can reasonably consider private.

First, Defendant's lack of official relationship with the company factors into whether he enjoys a reasonable expectation of privacy in the areas owned by the company. "The employee's expectation of privacy must be assessed in the context of the employment relation." *Id.* at 717. Here, the context of Defendant's employment relationship with Williams Wharf Oyster diminishes his expectation of privacy in the platform leased and used for commercial purposes by Williams Wharf Oyster. Defendant had no ownership stake in Williams Wharf Oyster. (Tr. 106:2-4.) Defendant drew no salary from Williams Wharf Oyster, and the company did not consider him a paid employee. (Tr. 105:14; 106:5-7.) Robin Hooper, the sole owner of Williams Wharf Oyster, testified that Defendant helped with the company, but did not specify any of Defendant's job duties. (Tr. 106:8-15.) Defendant offered no evidence as to how many hours per week that he worked. Indeed, the only specific evidence that Defendant put forth with respect to his role in the company demonstrates that at some point Defendant culled or shucked oysters for free for the company. Thus, Defendant can lay little claim to a reasonable expectation of privacy in the platform leased by Williams Wharf Oyster based on his "employment" there.

Next, even assuming that the platform constitutes Defendant's place of employment in which he plausibly could claim an expectation of privacy, the circumstances surrounding his use of the platform would not render that expectation reasonable. In examining an expectation of privacy in a place of work, courts look at the characteristics of the specific places searched. For example, the Supreme Court has held that an employee has an expectation of privacy in his desk and filing cabinet in a private office, *O'Connor*, 480 U.S. at 716, or even records in a shared

14

office where the individual "would have been entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his [] superiors." *Mancusi*, 392 U.S. at 369. The Supreme Court has also noted that employees' expectation of privacy in their "offices, desks, and file cabinets . . . may be reduced by virtue of actual office practices or procedures." *O'Connor*, 480 U.S. at 717.

Defendant's claim to privacy in the table on the platform does not comport with the areas that the Supreme Court has considered reasonably private. The platform does not resemble an office — either private or shared. Nor does the culling table on the platform resemble a private desk or filing cabinet in an office. Even it did, the culling table belongs to Williams Wharf Oyster and the company maintains it for all employees to use, rather than only Defendant. *See United States v. Horowitz*, 806 F.2d 1222, 1225 (4th Cir. 1986) (concluding that defendant did not have privacy interest in data storage tapes that constituted an "electronic filing cabinet," because the employer owned the tapes and maintained them for its own use). Moreover, Defendant has not produced any evidence that, while on the platform, he expected that "he would not be disturbed except by personal or business invitees." *Mancusi*, 392 U.S. at 369. And, given the open nature of the platform in a public waterway, it seems unlikely that he could produce any evidence to that effect.

Courts also look at the extent of control that the defendant exerted over the area in assessing the reasonableness of the expectation of privacy. "Control is measured by physical presence in, or access to the area to be searched, and by the ability to exclude others." *Horowitz*, 806 F.2d at 1226 (internal citations omitted). In *Horowitz*, the Fourth Circuit found that the defendant did not have a privacy interest in the data found on tapes that he claimed constituted his workplace, because he "lacked any ability to exclude others from the tapes." *Id.* The

employer controlled the defendant's access to the tapes, and other employees had similar access to the tapes. *Id.* Similarly, here, Defendant has offered no evidence that he had the ability to exclude others from the pier, the table or the platform. On the contrary, other employees used all three areas. (Tr. 113:15-17.) Although Defendant may have used the table on the platform, as the court in *Horowitz* noted, "occasional presence, without any right to exclude others, is not enough." 806 F.2d at 1226 (internal quotations omitted). And again, Defendant's lack of control over the platform defeats his claim to an expectation of privacy.

Finally, the openness of the platform proves fatal to Defendant's expectation of privacy. Importantly, "what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). Indeed, some offices "may be so open to fellow employees or the public that no expectation of privacy is reasonable." *O'Connor*, 480 U.S. at 718. Defendant's place of work constitutes one such office. The table on which Defendant left his phone sits on a platform connected to a pier that juts out into the river. Individuals on the river, which remains open to the public, could easily see the table on the platform. Neighbors from adjoining properties could likewise see the table. And, no gates or fences or "NO TRESPASSING" signs kept people from accessing the dock from land or water. (Tr. 63:25-64:4.) Finally, other employees enjoyed access to the table and the platform, and Defendant produced no evidence that any employees could not access the platform. In short, to the extent that Defendant claims the table and platform as his office, that office clearly qualifies as "so open to fellow employees or the public that no expectation of privacy is reasonable." *O'Connor*, 480 U.S. at 718.

At bottom, Defendant attempts to claim an expectation of privacy in a platform leased by a company with which he has no official relationship and that sits out in the open. Defendant has

16

fallen far short of his burden of establishing the reasonableness of this expectation. Therefore, the Court finds that Defendant cannot raise a Fourth Amendment challenge to the seizure of the Pier Phone.

C.      **Abandonment**

The Government also argues that Defendant lacks an expectation of privacy in the Pier Phone, because he abandoned it.[5] (Govt's Sup. Br. at 7-8.) The Court agrees.

"The law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence from the property." *Ferebee*, 957 F.3d at 412. In fact, "[t]here can be nothing unlawful in the Government's appropriation of . . . abandoned property." *Abel v. United States*, 362 U.S. 217, 241 (1960). A finding of abandonment rests on "whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned." *United States v. Small*, 944 F.3d 490, 502 (2019). The court performs an objective analysis, considering the defendant's actions and intentions, to determine whether he maintains a reasonable expectation of privacy in an item. *Id.* "Intent to abandon may be inferred from words spoken, acts done, and other objective facts." *Id.* (internal quotations omitted); *see also Ferebee*, 957 F.3d at 413-14 ("As noted, abandonment turns on the intent of the defendant as revealed through his words or actions, and it can occur without the contemporaneous knowledge of any other person."). The Fourth Circuit has cautioned courts against casually inferring abandonment; instead, "there has to be some voluntary aspect to the circumstances that lead to the phone being what could be called abandoned." *Small*, 944 F.3d at 503.

---

[5] The Government initially conceded that Defendant did not abandon either phone. (Govt's Resp. at 10.) However, based on the evidence adduced at the evidentiary hearing, the Government raised the argument that the facts now support a finding that Defendant abandoned the Pier Phone. (Govt's Sup. Br. at 7-8.)

17

Here, the Court can infer from Defendant's acts that he abandoned the phone. According to Smith, when Defendant noticed law enforcement agents near the property, he left his phone and knife on the culling table and walked off the pier onto land. (Tr. 117:15-118:3.) He did not own the pier or platform, nor the company that leased the pier. (Tr. 104:12-106:4.) As described above, he had no reasonable expectation of privacy in the place where he left his phone. He did not attempt to shield the phone from other employees or the public on the river who might pass by it. He likewise made no effort to shield it from the elements, thereby risking its destruction. When Defendant left his phone and knife on the table on someone else's platform in the public river, he ran the risk that strangers would come upon it. The fact that strangers could so readily access his phone gives rise to an inference of abandonment. *See Small*, 944 F.3d at 504 (affirming denial of suppression motion, because when the defendant "discarded the phone, he ran the risk that complete and total strangers would come upon it").

Moreover, no evidence exists that Defendant told Smith, who occupied the pier with him at the time, to safeguard the phone until he returned. On the contrary, Defendant simply told Smith, "[w]ell, I'm going to leave this here." (Tr. 117:18-19.) Smith's later efforts to shield the phone from theft and the elements after Defendant left do not change the analysis, as the inquiry turns on Defendant's intent at the time that he walked away from the table.[6] At the moment that he walked away from his phone and exposed it to the public, he completed his abandonment of it. *See Ferebee*, 957 F.3d at 414 (finding abandonment complete at time of act evidencing intent to abandon); *see also California v. Greenwood*, 486 U.S. 35, 40 (1988) (finding no expectation of privacy in garbage placed for collection, because the defendants had "exposed their garbage to

---

[6] Agent Brumbelow's testimony left some confusion as to whether he believed, at the time of the search, that Smith had concealed the Pier Phone in the cinderblock or that Defendant had. However, what Agent Brumbelow believed has no impact on the abandonment inquiry, which focuses solely on the objective evidence of the intent of the defendant. *Ferebee*, 957 F.3d at 413.

the public sufficiently to defeat their claim to Fourth Amendment protection"). Rather, Smith's actions — taking it upon himself to conceal the phone — demonstrate the exposed and vulnerable state in which Defendant left his phone.

In leaving his phone on a platform and walking away from it, Defendant relinquished his reasonable expectation of privacy in it, and the subsequent seizure did not violate Defendant's Fourth Amendment rights. Accordingly, Defendant lacks capacity to seek suppression of the Pier Phone under the Fourth Amendment.

### III. CONCLUSION

Defendant seeks to suppress evidence found on two separate phones: one that law enforcement seized from him while arresting him and one that law enforcement seized from an open platform in which he had no expectation of privacy. Accordingly, law enforcement agents did not need a warrant to seize either phone. Accordingly, Defendant's Motion to Suppress (ECF No. 28) will be DENIED.

An appropriate order will issue.

Let the Clerk file this Memorandum Opinion electronically and notify all counsel of record.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Dated: August 26, 2020

19